Good afternoon. Welcome back to all of you. We will proceed with the argument of Te-Moak Tribe v. United States Department of the Interior. Ms. Hanson-Young, who's going? Who's first? I'm confused by this. Hanson-Young, no? What? No. I say. Oh, I got it. Okay. Go ahead. Yes. Mr. Flynn. I was misreading the document. Go ahead. All right. This says 20 minutes. You are not required to take 20 minutes. I'll probably take some for rebuttal if it's acceptable to the Court. Good afternoon, Your Honors. My name is Roger Flynn, and I represent the tribes and other appellants in this case. With the Court's permission, I'd like to focus on the issue that's gotten the most national attention, the most briefing, and that's the issue of BLM's duties or they feel lack thereof to protect Native American or Indian sacred sites on public land. I'd like to focus on those issues. So you're addressing, then, the claim under FLPMA? Yes, FLPMA and the executive order. The statute is FLPMA. As I think all parties admit, the sacred sites executive order does not have independent force of law, but it's, as BLM has stated to other courts and as the various Ninth Circuit and Tenth Circuit cases have said, the executive order is part of BLM's land management duties. That leads to the first issue I'd like to talk about is whether the executive order applies to BLM's management of public lands. Now, BLM and the mining company ---- Well, they're not arguing it doesn't apply. My understanding is that at one juncture, the government says maybe it's only procedural, but they don't say it doesn't apply. Well, originally, that's right, Your Honor. Originally, they had said it didn't apply. But now, BLM argues it's only a procedural duty to consult and to inform the tribe of what's going on. Am I correct? It seems like we've seen this before. And am I correct that there was an ethnographic report that was done back in 2004? That was done on contract to the BLM or to the company, which then it was part of the record here. And that ---- Right. Right. And the purpose of that was to study the practice and understand the religious practices of the tribe? That's correct, Your Honor. And that report found that the key issue here is not the top of Mount Denebo, as the western Shoshone call it, or the sheer cliffs. It's right below the cliffs is where the mine is. It's called the project site, 6,000, 7,000 acres. Can you clarify something for me? Sure. Is the project site the same as the Petermann area and the same as the Pinion-Juniper forest, or are they overlapping, or exactly what is their relationship? The project's ---- the Petermann area is the larger, flatter slope of the mountain, so it's ---- the Petermann itself is a little larger than the project site. Some of the project site is actually out where they're going to dump all the water in Crescent Valley 12 miles away. So the project site is ---- That site is huge. Yes. 6,000, 7,000 acres. Most of it, the mine pit, the waste dumps, the cyanide dumps are on the Petermann area. The Pinion-Juniper, and that was mentioned in your PI preliminary injunction decision ---- You claim that the ---- Oh, wait a minute. Just finish. So the Pinion-Juniper reference to that is to what? A subarea of the subarea, essentially, of the Petermann area? Well, the Pinion-Juniper forest at the mine site has been largely destroyed by the company now, but it's what that's the Petermann area is mostly trees of Pinion-Juniper. So they call that the Pinion-Juniper forest. So the Petermann area and the Pinion-Juniper area are essentially coextensive? Yes. There are some ---- The project area is bigger than that, but includes it? No. The project area is a subset of the Petermann area. The Petermann area contains some grassland off to the side a little bit, but the Pinion-Juniper area at the base of the cliffs in the ethnographic report and in the various statements and formal resolutions and letters submitted by the tribes to the BLM, the project site is on the Petermann area, which the primary biometallic species are Pinion-Juniper. You claim that the entire project site is a sacred area? No, Your Honor. There are areas out in Crescent Valley that were going to be dumped in the water and having some of the infrastructure for the project that the tribes have never filed a lawsuit against, and the sacred site, if you look at the tribal submittals to BLM, they talk about the Petermann area and the project site area as part of the Denebo sacred area. That's what the ethnographic report found. And I think it's an interesting issue because the reason I'm asking you this question, though, and I'm still not clear on it, first of all, you agree that the executive order applies only to discrete sacred sites? Yes, designated by the tribes, which is what the President ordered. And so what do you claim, then, are the sacred sites? It's not the project area site. No, the project area — excuse me, Your Honor. The project area is within — it's on the Petermann area of Mount Denebo. It's on the mountain, and that's part of the sacred site. The project site is part of the sacred site. Well, I mean, so your claim is what sacred site? The whole mountain? Basically — At one point, yes. Well, the mount — the top of the mountain, the cliffs, and the Petermann area, and that's what the ethnographic report recommended. But that was just BLM's report. The tribe has it larger. It's this issue of discreteness and how big is the — you know, how big is a sacred site under the executive order. First of all, as I think the law professors who — who the leading treatise on and case books on Native American law basically said, and the BLM admitted this in their handbook, that it's the tribes, not the BLM or the Forest Service or the Department of Agriculture or Interior, that designate the sacred sites. The President entrusted the tribes with this. And the law professors, I think, did a good job of explaining why in the history of our treatment of Native American lands, why that tribe had it necessary. Well, I mean, it has to be — just — I mean, so is your basic legal argument that if somebody — some respected member of the tribe says that this is a sacred area, then under the executive order, it has to be preserved, period, at the end? Well, the — it has to be a tribal government or a recognized religious elder. Right. And that's what — And if they designate it and this — any project is going to affect it, you can't do it. Well, the BLM has to evaluate it under the auspices of the executive order, which they didn't do here. They said the executive order only applied to the top. I understand that. But I'm asking you what your legal position is, because as I understand it, your legal position is that this executive order is not simply procedural. It is substantive. And your other position is that it's a self-designation. So therefore, putting those two together, I get if it's properly self-designated and it is affected, that's the end of the story. Is that your argument? Yes. The tribes designated the area. One of the things that may — there may be confusion that there's some list of sacred sites out there. It doesn't exist. There's no — what happens is it goes on a case-by-case basis. The tribes have — the government has to consult with the tribes, and there's a project affecting aboriginal homelands, as this is. And then the tribes submit letters and resolutions and notices saying, well, this is one of — this is a sacred site under the executive order. That was the case in the access fund case in the Ninth Circuit, the Wyoming sawmill case in the Tenth Circuit. And then the federal government has to then act to — looks at that and then has to act to protect it, allow access and avoid physically damaging the site. Now, particularly, the mining company has argued that this is some sort of religious servitude that's going to shut down development all over the West. We feel that the tribe on a case-by-case basis here, the various tribes, as well as one of the letters that the BLM did not respond to was from the Shoshone Paiute tribe. We focus on that on page 16 of our reply brief. They specifically put the BLM on notice that the project site on the pediment area was a sacred site under the executive order. And, you know, I think the access fund case had a very — put it well that this does not mean that there's some sort of religious servitude or anything like that or non-Indians have to bow to the religious wishes of Native Americans on public land. But what I don't understand is what — where in the record it shows that the — that the pediment area was an area that was used for religious observances. My understanding when I went through this was that they picked pine nuts there. That's — that's one of the cultural aspects. But I think starting page 1516 on our reply brief, if I may quote the letter from the — the 2008 letter from the Paiute tribes, it is well established that the Western Shoshone people practiced religious ceremonies within the project area. The project — another part of that letter — Nobody's disputing that. What? Nobody's disputing that. Well, that's the project area is the pediment. Is on — is the pediment. The project area, if you think of it this way, the project area here, the pediment's a little bit larger than the project area. There's part of the pediment area that will not be affected by the project. In other words, the top of the mountain and the White Cliffs and the Horsewood Valley, or whatever it's called, are all not actually the project area. They're outside the project area. All outside the project area. Right. And so when there's a reference to the project area, you're — you're taking it to mean the actual project area, not something around the project area. Right. No. It's the project site where the mine pit and the dumps are all there. There are also a number of specific letters from various people that are somewhat more specific about saying — and we mean the pinyon-juniper forest or whatever. So — But they go there for prayers and continue. Well, they could until the mine started. So what is your understanding of the government's response to this, that these are not sufficiently specific, that they're not by the right people, that they weren't admitted at the right time, or what? Or we don't have to listen to them? Well, a couple of those issues right there. They weren't these — the Shoshone Paiute, the Timok Tribe, the Reno Sparks Colony all said the project area should be covered, particularly the Shoshone Paiute letter says that the — they specifically quote the executive order saying this has to be protected under the executive order. BLM, interestingly, in the final EIS, doesn't even respond to that letter. We only found out about that in the administrative record long after the P.I., after the preliminary injunction had been gone. Now, the BLM — You only found out about what? I'm sorry. Excuse me? You only found out about what? We didn't know. I didn't know about the Shoshone Paiute letter. It's a tribe in northern Nevada. But they sent it to the BLM, and we found that in the administrative record. That's the one you just read from? Yes. Portions of. It's on — it's in the excerpts of record, and it's a — our reply brief on page 16 quotes it. There's two issues I think in Your Honor's question very important. One, the BLM says, well, it was just some Native Americans told us about this. Well, it was the tribes. And the President said the tribes or religious — respected religious leaders can do it. So we think we satisfy that. The other issue was that it wasn't narrow or discreet going to Your Honor's question. And they specifically said the pedimentary, the base of the cliffs, the evidence I think is overwhelming. People go there to pray in their way. Obviously, Native American religious practices are different from other religions. But we think the executive order in the law recognizes those. And I think the other issue that the — the other defense of the government, so to speak, is that — and the district court. Their specific quote was, there is no evidence, no evidence in the record of any religious use by any Western Shoshone of the project site. We've quoted the numerous times where the district court verbatim basically quoted from the BLM in its decision. When you look at the record here, remember, this is an Administrative Procedure Act case. Really, when you boil it down, it's an APA case. Their decision has to be based on the record. They can't contradict the record. And, in fact, the draft EIS for the BLM actually said — and we talk about this in our reply brief at page 22 — that there will be direct and indirect effects to spiritual and religious use of the project area. That's in the draft EIS. They sent the draft EIS to Barrick and the public. Barrick wrote a letter saying, delete the phrase spiritual and religious uses of the project area. So you look at the final EIS, that's gone. Barrick — and we pointed out in our reply brief — Barrick also authored the key phrase, no Western Shoshone religious uses at the site will be significantly affected. And so we think that sort of manipulation of the record — you know, I haven't seen that in a while, looking at EISs and administrative records. And we only found that out when we dug into the thousands of pages and we said, holy cow, Barrick told BLM to take that out, and BLM obliged — I don't really see the relevance of that. I mean, they could have been taking it out because it was inaccurate. I mean, so — It was in their draft EIS. But, anyway — They changed. Yeah. That's why they had drafted the EIS. Okay. Granted, Your Honors. The main issue is, is there evidence in the record that there are religious uses? Because the BLM and the district court — There is one place in the record on — it's on S.E.R. 890, one of the responses to the S.E.R. — I guess to the supplemental, where the government says, the top of Mount Tanabeau, the pinyon juniper stands at the base of Mount Tanabeau. And an area near the historic Shoshone have been identified as specific sites for these practices, including solitary prayer and similar practices. So, I mean, that's why I wanted to know whether the pinyon juniper stands at the base of Mount Tanabeau is the — is what you're talking about. Is that the overlapping area? Yeah. That's where the sacred site is, and that's where the mine is. I believe we quoted that on page 24 of our reply, and it's excerpts of Record 381, where BLM, in some places, admitted that there are religious uses here. They took some out into the final, but they admitted that there are religious uses. So, again, I think it goes down to just the APA. They said there are no — there's no evidence of religious uses here. If that's true in the record — If we decided they were wrong about there being no evidence of religious uses, then what do we do? Do we — then we — I mean, what disturbs me is, as I understand your argument, it's then you win, QED. Well, I think that's the definition of an arbitrary and capricious action when they base their decision. Well, that's different. I mean, that's why I asked the question. On the one hand, we could say you have the record wrong. Go do it again. But your argument essentially is that if there is evidence of the right kind from the right people of religious use here, you win. I mean, no project. Stop the project. I think that's — that shows that there's an arbitrary and capricious. And under the APA, you — the Court shall set aside the BLM's decision. Well, I understand that, but we can set it aside two different ways. One way is you didn't do it right. Go do it again. And the other way is there's nothing you can do to fix this. Stop the project. Your Honor, this case has been going on for a while. Yes. And sending — and sending it back for another environmental review where, unfortunately, we believe the BLM, you know, paper's over, its decision already made. The tribes want to be able to get back and save what's left of the mountain. There's a lot of mining going on, as the company will probably say. I mean, there's also, in general, the government's position is there's been mining here for 150 years, and nobody complained. And now, essentially, I mean, what if they just said we don't believe this? Well, the President said it's up to the tribes to designate the sacred sites under the executive order. The BLM doesn't get any deference. And, Your Honor, and I'd like to save some time for rebuttal, so if I can close on this one thought, unless there's a question. Let me finish, and then we'll go to it if there's another question. Yes, there's been a lot of mining going on, and the Western Shoshone have suffered for 150, 60 years on behalf of the mining companies and the federal government. This might be the last straw. They said not here. We've got to draw a line in the sand. This is too central to what we believe as a people, and that's what matters here. And that's why we ask not — I mean, we think it should be remanded on NEPA. That's been fully briefed. But really, that this violates federal law, and — But what does? The record of decision approving the mine. That's the — and the EIS is done with the record of decision. So the decision to approve the mine violates federal law. And that's what the — that's what this case was about when it was — went back to the district court? Yeah. We've been challenging the record of decision issued in 2008 all along, but then there's been — there was the 2008 environmental impact statement, and then the 2011 one. This case didn't actually go back to the district court. We had a preliminary injunction appeal. We decided the preliminary injunction appeal. Now we're deciding the summary judgment on the final judgment. Right. And although there were changes in the meanwhile responsive to the preliminary injunction, that's not really what we're reviewing. We're reviewing the final decision as supplemented, but not — it's not a question of being limited to the remand because the remand was — it wasn't really a remand. Right. It was just a preliminary injunction. Right. The record of decision was issued in 2008, and I just misspoke. There was a supplementary, so to speak, record of decision when they redid the EIS upon remand from this Court and the district court. Okay. So that's what we're asking. Well, so which — which decision are you talking about that was — that the district court? The two decisions authorizing mining was the 2008 record of decision, and I believe it was 2011 — 2010-2011 when they essentially reauthorized it. Well, are we reviewing a decision of the district court? Well, yes. There's two summary judgments. It's a tortured process, but there was an initial summary judgment where it was partial, and then finally on the merits decision in 2011, the district court — it might have been early 2012 by now. Well, it was January 2012. I'm just trying to figure out what — what you are saying the district court did wrong. Right. There were two summary judgment decisions that were adverse to us. Yes. The one — the first one on the merits, and then on the merits when they redid the EIS. So there were two summary — Actually, the issue you're arguing now is the first one. That's relevant, not the second. Well, the second one was very minor. The first one is the one that approved the massive destruction. The second one was more on the — on the supplementary EIS. But essentially, there were two decisions. The company relies on two decisions to go forward with the mine. So you're talking about the 13th of April, 2010 decision? Yes. I'm sorry with the — we were evacuated from the floods in Colorado, so I don't have everything in front of me. But I believe that that's it, Your Honor. It was the first — it was a summary judgment decision, the first one, and then there was the second one in January of 2012. Those are the two decisions. Okay. Thank you. We'll give you a couple minutes to rebut. Thanks very much. Can you tell us first how you're dividing time? I'm sorry, what? Can you tell us how you're dividing time? We are dividing time 13 minutes for the government and 7 minutes for the respondent. So it's up to you to keep your time. Go ahead. Yes. Good afternoon. My name is Tekla Hanson-Young, and I represent the Bureau of Land Management. With me at counsel's table is Jim Butler, who represents Barrick, and as I just said, we will be sharing time. BLM took its obligations under FLTMA and the unnecessary or undue degradation standard very seriously, and particularly as its obligations relate to ensuring that cultural resources will not be unnecessarily or undue. Well, I agree that you did an enormous amount of work, but I am concerned with this notion that there wasn't — or why you think there wasn't specific — a sufficiently specific claim with regard to either or the project area, the pinyon, juniper forest, or the pediment, which I gather are essentially the same thing. If they're not, you need to tell me that, in various places in the record, including in places where the government seems to recognize the claim. The pediment area is a larger area. It's on the western slope of the mountain. The project area comprises about 60,000 acres within the pediment area and other areas. The actual acreage of disturbance is about 6,500 acres of actual land disturbance. Of actual what, I'm sorry? Of actual land disturbance. Okay. The — the project area actually remains open, except — the entire 60,000 acres of project area remain open, except for the 6,500 of — 6,500 of acres of land disturbance, the 60,000 acres that are disturbed. The — So is the problem that when — if the letters or the claims say we use the project area for religious purposes, that that isn't sufficiently specific? That's the problem? Well, what BLM — BLM acknowledged those letters, first of all. And — and the difficulty, when BLM receives information and letters from western states, is that it has to decide what to do with that information. So when it receives a statement saying the entire mountain — No, no. Not the entire mountain. I'm not talking about the entire mountain letters. Well, which is the — Let's put those aside. I'm talking about the ones that talk either project area, pediment, or pinyon, juniper forest. Sure. And what BLM did to mitigate the mining project's impacts to those areas — well, first of all, let me back up. The — the pediment area contains pine trees, essentially, which are used by western Shoshone to gather pine nuts. The pediment area actually is not currently — Is that a religious use, gathering pine nuts? It — the record reflects that the gathering of pine nuts reinforces cultural identity. Whether or not it's religious is not for the government to say. It's just what is in the record. The — the record also reflects that the pediment area contains immature pine trees, and so it is not currently able to be used for pine nut collection because of historic deforestation that occurred. So those specific letters that talk about use of the pediment area for pine trees refer to the fact that future pine nest harvesting will be impacted. And if you look in the — in the supplemental excerpts of record, there's a discussion between SER 289 and 290 and SER 304 — oh, no, I'm sorry, SER 290 and then SER 309 to 311 and 315. There's a discussion about the impacts of the project on pine nut harvesting. And that — those sections of the FEIS basically talk about how current pine nut harvesting is not going to be impacted because there's no current pine nut harvesting in that area. I mean, for example, there's a letter in — from Carrie Dadd, who I gather there's somewhere in the record that the government says that the Dadds are authoritarian — somewhat authoritarian — authoritative on these — as to religious practices. And she says the area, which is — let me see now. The area includes Mount Geneva and its slopes, including the pediment area below the summit, all of which remain spiritually and culturally significant. All right. So that's not good enough because it doesn't say only religious? No. BLM actually took those statements at their worth and acknowledged that some Western Shoshone individuals would never be satisfied by any mitigation that BLM could do to mitigate the impacts of the mine. Kagan. So let me outline the possibilities the way I did before. So it's your argument that there's not sufficient evidence in the record that this area is religiously used, or is it it's not by the right people, or is it that, yes, we accept that it's religiously used, but we have to go ahead anyway, we can do that? Which is it? It's sort of the first and the third. BLM looked at the specific areas that were specifically delineated and ensured protection of those areas to the extent that it could. And with respect to generalized comments concerning the entire area, BLM essentially said the government acknowledges that there are going to be impacts — I'm not talking about the comments on the entire area. Let me repeat that, okay? Including the entire area. There are some specific comments. Sure. Okay. And with respect to those comments — I did not understand them to be acknowledged, but you're now saying they're acknowledged. They absolutely were acknowledged. And there are — And you're briefly saying that they really never made any specific claims about these specific areas. And I understood the EIS to be saying that, too. Right. The EIS said the information in the EIS indicates that there were specific areas that BLM protected, and where no specific areas were identified, BLM also acknowledged that there would be impacts that it could not mitigate. Right. But what about where other specific areas were identified? You're saying you acknowledge that there were other specific areas identified. Well, with respect to, for example, the pine groves, there — I believe it is in a response to comments that is cited in my brief, where BLM says no specific pine groves were The project is only going to remove permanently about 800 acres of pine groves. It will temporarily remove 1,600 acres. So there's no indication — there's nothing in the letters that indicates that the removal of the 1,600 acres of pine groves will prevent a practitioner from practicing their religion. And even if it did, and this gets back to the role of the executive order, it's not clear what BLM could have done to accommodate those religious practitioners, aside from simply stopping the entire mining project. So that leads to a legal question, which is what is — suppose you had specifically acknowledged that this was — that there really were, say, religious practices in the particular area where the mine was. Do you have any obligation to do anything? Well — I mean, does BLM have any obligation to do anything? BLM — the BLM did what it could do, basically. There's no — the executive order does not impose any substantive requirements on BLM. However, BLM acknowledged that it was going to evaluate the information it had under the rubric of the executive order. And it looked at access to all of the area, except for the acreage that would be permanently disturbed, and particularly the important sites that were determined under the NHPA, such as the top and the white cliffs. Go ahead. BLM also looked at — I'm sorry. Go on. No, go ahead. When I say that BLM acknowledged that there would be impacts, there are certain pages in the record, for example, at SCR 340, where BLM acknowledged that there would be some residual adverse effects to Native American values, and also spiritual use. That's at SCR 292. BLM basically took the information that it — that it received from Western Shoshone after years of consultation, where it could identify specific sites, it protected those to the extent that it was able to do, where there were no specific sites that were identified. For example, the Petaluma area is huge, so — and this mining deposit is located in the Petaluma area, which is open for location for mining. BLM, therefore, did not have enough information to say — to enact certain pine groves in the Petaluma area. The letter from — I believe it was Carrie Dan — states that she uses the project area for her — for her religious use, but she does not identify specific areas and does not ask BLM to protect the specific areas that she uses. Without that specific information, which BLM can't require the tribes give, then BLM can't do anything more than what it did. Sotomayor, I'm having — I'm just having a little trouble understanding what we're doing here. When this case was before us earlier on preliminary injunction. Yes. It was my understanding that the position of the tribes was that the entire mountain was sacred and that the BLM had not adequately studied the effect on the entire mountain. That's correct. And we essentially said that while it's true that they talk about the entire mountain, it — they really are concerned about specific sites, not the entire mountain. And then we said that that — and so, therefore, we said, well, there was study of those specific sites, and so we don't think they're going to have a reasonable probability of success in showing that it was the entire mountain and that there was inadequate study under 1307. Now, we're here now, and the argument is there wasn't enough study of the particular sites. And that seems to boil down to the one site — to the one area, which is the pediment area. Is that how you understand where we are here? That's my understanding, but the — my understanding is that the tribes view the pediment area as being a part of the whole mountain. Right. Part of the whole mountain, but not the whole mountain. Right. Right. And that the pediment should not have been separated out from the top of the mountain and the White Cliffs. That's my understanding. But let's go back to the executive order. Is your ultimate position that the executive order says, in managing Federal lands, each executive branch agency shall, to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions, accommodate access to and ceremonially use and avoid adversely affecting the physical integrity of such sacred sites? So is your ultimate — and this is why I'm asking you. This is why I was trying to get your position clear. Is your ultimate position that even if this — their claims were sufficiently specific, and even if made by the right people, it wasn't practicable, permitted by law, or clearly — or it was clearly inconsistent with essential agency functions to accommodate them? Is that essentially what you're arguing? That is correct. Was that ever said by the BLM? BLM did not specifically say that. But this Court can look at its analysis in the EIS, which incorporated all of the — all of its statutory and policy directive obligations in its EIS. And it — and can — this Court can, therefore, it can infer by looking at BLM's impacts to access, for example, that it — that it — it decided it could not accommodate — further accommodate what the tribes are asking for, which is essentially to not authorize the mining project. Again, BLM did acknowledge in the EIS that there would be impacts that could not be fully mitigated by BLM. And this Court can use that statement to infer that it was making a decision that — that it could not. We don't usually, in administrative cases, infer things. Sure. Well, it's reasonably discernible from the record what — what BLM did with respect to its analysis under the executive order. There's just a couple of points that I wanted to make quickly. In his opening, Mr. Flynn referred to a letter that — that wasn't — that BLM didn't consider. That is actually at — ER-470 is the letter. There is two — I believe there's two paragraphs in the FEIS where BLM talks about this letter. That's at SER-274. And the letter was essentially a request from one of the tribes to be more involved in the consultation process, and BLM then folded that tribe into the consultation. So, again, please look at two — SER-274 for that information. Also, I would like to direct the Court just to look at SER-288 for sort of an explanation of why the language changed in the EIS with respect to the religious use versus the traditional value areas. If this Court has no further questions for me about the tribes' NEPA claims or the FLTMA claims, then I would like to give the rest of my time to Jim Butler. But if there are other questions — I guess I'm trying to find a specific place in your brief. I'm not succeeding quickly enough. But my overall understanding of your brief was the position that — not the position that I understand you now to be articulating, but that there was simply not a specific enough claim with regard to a specific enough area, and that the — that there were essentially — and so you're sort of switching gears. And I just want to make sure that I understand that. No, that's not — we're not switching gears. That is correct. BLM looked at the information that was provided by the tribes as to specific areas. And it made a decision that it could protect certain areas. There was enough information in the studies, based on its, you know, 20 years of studies of this area, that it could — that it could protect certain areas. It could — that certain properties were eligible under the National Historic Preservation Act, and it also analyzed those specific sites under the rubric of the executive order. For example, in the FEIS' discussion on impacts to access, BLM specifically looks at whether individuals will still be able to access the top of the mountain and the White Cliffs. All right. So I'm reading now from page 32 of your brief. And it says, as a result of BLM's exhaustive analysis, BLM, quote, did not conclude that the Western Shoshone use the project site for religious activities or that the site is a central part of Western Shoshone religious practices. And that's a different statement from when you said we recognize that, in fact, they — they have claimed that, but we can't accommodate them. BLM did decide that there was not sufficient evidence in order to — I'm sorry. I'm just trying to find that. That was on — you said that was on page 33? 32. 32. Okay. Thanks. No. Maybe that's wrong. I'm sorry. Let me see. Where did I just find that? Page what? Yeah, it is 32. 32 of your brief, I think. 32 of somebody's brief. I think that's correct. Yeah. Oh, wait. So that — that — I'm just going to look at that. There's a site to the record there. It's ER 381. And I just want to look at what that specifically refers to, because there's a couple of — there's a couple of different issues going on. There's religious uses. There's cultural uses, such as the pine nut gathering. There's — there's different sites. And so — and also there's the larger conclusion that although West — some individual Western Shoshone may not be able to use the particular areas that are being disturbed to gather pine nuts anymore, or if they conduct religious activities there, they won't be able to use that particular acreage. But there's no indication in the record that they would not be able to use another location in the pediment area that's outside the project area or that's in the project area but where land is not being disturbed. Being disturbed. My — I guess this is a very confusing case because there's some shifting sands here, but my understanding was that originally the — the plaintiff's position was that you had studied the sites, but you hadn't considered the entire mountain, and that was the whole problem, was that you had looked at particular sites and not the entire mountain. And now we have the — now we have the argument that one particular site was not — you didn't adequately take into account that there was going to be interference with activities. As I read the — what was in your brief, it was not — and in the record, it was not that there were any religious activities that — that — in that area, but that there was this — the picking of pine nuts, and there was a big area where they could do that that wasn't affected. That's correct. All right. Well, we'll give your colleague a few minutes. Thank you. May it please the Court. My name is Jim Butler, and I'm here on behalf of Defendant Intervenor Barrett Cortez, Inc. I want to make one run at the geography question because I still think it's confusing. The project area, the pediment, and the Pinyon-Juniper area are three different areas. Well, they're overlapping. They overlap in parts, yes. They're like a Venn diagram. You know, part is one of part. The project area is a large, irregular-shaped polygon that stretches across a valley with a conveyor belt. It's 60,000 acres. The pediment, there's no line. It's a sort of an amorphous definition of the slope of the mountain as it comes into a valley. The Pinyon-Juniper area is essentially gone on the part of the pediment that's been historically mined, but then runs up the mountainside and goes beyond the pediment and beyond the project area. So when Mr. Flynn says that the project area equals the pediment area, that's not correct. And in the letter that he cites from the Paiute Shoshone Tribe, which the government talked about how BLM addressed that and responded to the tribe. The letter itself says we're talking about the project area in Lander and Eureka counties, and that's in his letter at 470. Again, introducing another geography question, the pediment is entirely in Lander County. The project area stretches over into Eureka County. So when they say project area Eureka-Lander County, they're talking about something bigger than the pediment. And that's part of the confusion that BLM has had, is they've had they've looked you know, you've got declarations and letters that say project area, that say pediment, that say Mount Tenobo, that say whole mountain, and trying to sort that out is part of the issue that the agency faced in doing that. And in terms of the executive order, the executive order says, as you looked at that language, to the extent practicable and consistent with the other legal authorities. That's the judgment that BLM had to make. They took the evidence, but they also took this overwhelming amount of evidence, historical, archaeological, contemporary observation that says the pediment area is not currently being used and has not historically been used since at least 1863 for religious purposes. Now, BLM acknowledged that there may be an isolated individual who prays there, and there's language in the EIS that says some of the area may have been used, may have been visited by individuals, but they didn't find the executive order uses the term established religious use. The executive order uses the term ceremonial use. They didn't find any of that. And they found that in the EIS. Kagan, where are you looking at in the EIS, for example? Kagan I'm looking at Section 3.9 and in responses to the comments, and I don't have those right on the tip of my tongue, but Section 3.9, there is a section that talks about historical use of the entire area, and they say that there may have been individuals who go to all different parts of this area. Now, in terms of identifying a specific site within the larger pediment or project area, BLM was unable to do that based on either the documents or the consultation. And I think it's important to understand that the consultation involved BLM on the ground, on the site, with members of the Native American tribes. They were there. They were looking at the mountain. They were standing on the pediment. And they did not identify, say, that rock or those trees or that valley. So BLM was trying to balance the information that they had from the tribes, the information that they had from individuals, the historic information, the archaeological information, and then put that in the context of their various cultural resources and Native American obligations, including the executive order. And what they said is, well, we're going to change the project. We're going to move the pit. We're going to ask Beric, tell Beric to move the pit away from the White Cliffs, which they did. We're going to designate Mount Tenobo White Cliffs as a property of cultural and religious importance, and we're going to keep that outside the project area. We're going to take this area around Shoshone Wells or Shoshone Camp, and we're going to put that outside the project area. And then in terms of this part of the project, which is on the pediment, where the main part of the Cortez Hills Mine are, we're going to approve that. And that's what they did. And I think that's consistent with their obligation to the executive order. I think it's consistent with their obligation under the FLIPPA and the 3809 regulations, and I think it's consistent with their NEPA obligation. Kagan. Thank you very much. Thank you. Give me two minutes in rebuttal. Thank you, Your Honor. If I get BLM's answer, they're saying, we didn't know what you were talking about because you said the project area is where we conduct religious ceremonies, and it's currently used for religious purposes. They're saying, well, the project area for the review was 60,000 acres. Why would the tribes, every single tribe in the area, object, say, object, this violates our religious practices, we use the area, if they were talking about an area that wasn't being impacted? I mean, that just boggles the mind that the BLM would basically say, we didn't know what you were talking about when you objected to the project, the disturbance of religious uses in the project area. Oh, we thought you were talking about areas outside the disturbed area. That doesn't make sense. The issue of one of Your Honor's questions about the lack of study, I think we're past the point where they're debating whether they studied or not. We think under FLIPPA and the executive order, they have to protect the site. They have to protect the project area. Kagan, do you have any comment on the language of the executive order, which doesn't certainly doesn't read like the imprimatur that you were suggesting? I didn't hear the end of that, Your Honor. You were suggesting in the earlier argument that if there's an impact under the executive order, they can't do it. From my reading of the executive order, which I read a few minutes ago, it doesn't read that way. Well, I would say you can't damage the physical integrity. I'm sorry, what? You can't damage the adversely affect the physical integrity. No, it doesn't say that. It says, shall to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions, you should accommodate access to and ceremonial use. Right. So that doesn't sound like you can't do it. Well, we said under their duty, as they said, as we pointed out in our briefs, they have the duty. They've said FLIPPA requires them to protect irreparable damage to cultural and religious resources. And with the E.O., that's part of their function. FLIPPA tells them they have to do that. They've admitted that in Federal other Federal courts, as we talked about in the briefs. So the executive order is part of their FLIPPA duty to protect cultural and religious values. So to the extent practicable --- But what about all the caveats in the executive order? Well, that's -- well, if there was no other law, again, if there was no other law requiring BLM to protect valuable public land resources from mining and logging and all this other stuff, then they'd be right. But FLIPPA says they have to prevent under-degradation. But, for example, it says to the extent practicable. They say, well, we have an obligation to let otherwise valid mines go forward. So it's not practicable. Well, in the cases that have gone to the Ninth and Tenth Circuits, Access Fund, Wyoming Sawmills, they said the use is prohibited. I'm sorry? What? The use is prohibited. The Federal government has enforced the executive order in these other cases that the circuit courts have upheld to challenges by resource users saying, you can't say no to us. That's a First Amendment violation. Or you can't -- the executive order doesn't apply. And the Ninth Circuit and the Tenth Circuit said it does. It's a requirement that they have to do. Okay. Thank you all very much. Thank you very much, Your Honor. I'm not sure how illuminated we are, but we are probably more illuminated than we got here. Thank you very much. The case of Chemoke Tribe v. U.S. Department of the Interior is submitted.
judges: Schroeder, Tashima, Berzon,cjj